Filed 5/9/13  P. v. Bertacco CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

|  |  |
|---|---|
| THE PEOPLE, | C064349 |
| Plaintiff and Respondent, | (Super. Ct. No. SF110257A) |
| v. | |
| YOSSELIN BERTACCO, | |
| Defendant and Appellant. | |

The trial court  placed defendant Yosselin Bertacco on five years formal probation and ordered her to serve one year in county jail after a jury found her guilty of felony hit and run (Veh. Code, § 20001; unless otherwise designated, all statutory references that follow are to the Vehicle Code ), driving an unregistered motor vehicle (§ 4000, subd. (a)), and driving with a suspended license (§ 14601.1, subd. (a)).

On appeal, defendant contends (1) her conviction for felony hit and run is not supported by substantial evidence, (2) admission of evidence of her outstanding arrest warrant was error, (3) she is entitled to additional presentence custody credit, and (4) the booking fee was wrongfully imposed.  As we will explain, defendant is entitled to

1

additional presentence custody credit and the booking fee must be stricken. In all other respects, we affirm the judgment.

## FACTS AND PROCEEDINGS

At approximately 3:00 p.m. on November 18, 2008, D.C. and K.M., both 12 years old, were walking home from school. As the girls entered the crosswalk at the intersection of Pershing and Picardy/Acacia, they were hit by a car driven by defendant. Defendant's driver's license had been suspended and her car registration expired. D.C. landed in the gutter. Defendant stopped the car momentarily and, through an open window, asked if the girls were okay. When neither girl responded, defendant drove away.

Alan M. was stopped at the intersection of Picardy and Pershing at the time of the collision. Although he did not see defendant's car hit the girls, he saw D.C. lying on the ground immediately after the collision. In spite of "No Parking" signs posted on Picardy, Alan M. parked his car near the sidewalk and helped K.M. pull D.C. out of the street and onto the sidewalk. He called 911 and instructed K.M. to run to a nearby fire station to get help, which she did. Emergency fire crews arrived on the scene within minutes, and firefighters began to treat D.C., who was in and out of consciousness.

Bobby J. and his son were sitting in a car waiting for the stoplight at the intersection to turn green when the collision occurred. Bobby J. heard an engine "rev really loud" and saw defendant's car hit D.C. and K.M. in the crosswalk. The collision caused one of the girls to spin around sideways and the other to roll up onto the hood of defendant's car, hit the windshield and then fall to the ground. Bobby J. watched as defendant "slowed down, picked up speed, slowed down, picked up speed" and drove away. When Bobby J. realized defendant was not going to stop, he made eye contact with her, made a u-turn, sped up and chased after her. After about a block, defendant made a right-hand turn onto Poplar Road. Bobby J. followed. Defendant drove

2

approximately 50 feet down the street and parked her car. Bobby J. pulled up alongside defendant's car, made eye contact with defendant and told her she needed to go back to the accident scene. Defendant got out of her car and "hobbled a little bit, grabbed her leg as if it were hurt or something," and then headed back toward the intersection.

Bobby J. continued around the block and returned to the site of the collision, where he parked his car on the street. D.C. and K.M. were being tended to by emergency personnel. Bobby J. saw defendant and watched her for several minutes, but never saw her approach any of the emergency personnel. When bystanders asked what happened, Bobby J. heard defendant ask, "Que paso?" meaning, "What happened?" Bobby J. approached one of the fire personnel and identified defendant as the driver of the car that hit the victims.

When police arrived, Bobby J. told them where to find defendant's car. As police and paramedics walked in the direction of defendant's car, defendant walked in the other direction into the park and away from her car.

Stockton Police Officer Sean Raines arrived at the site where the accident emergency personnel were treating the victims. Officer Raines walked one block south on Pershing and turned onto Poplar. He found defendant's tan Chevrolet Impala parked four houses down. There was damage to the front of the car, the hood was dented and there was a crack in the windshield. Two firefighters were sitting on the sidewalk near the car. A minute or so later, Officer Barrera arrived. As he and Officer Raines spoke, defendant walked towards them. The officers asked defendant if the car was hers, and she told them it was. When they asked defendant if she had been involved in a collision, defendant said she had and added, "Yes, it is my vehicle, but I was just on the phone calling my family, and I didn't leave the scene or anything." Defendant seemed to lack interest in the situation and the questions being asked, and answered the questions in a "calm and evasive" manner.

3

Officer Barrera placed defendant in the patrol car to wait while Officer Raines returned to the accident scene to question emergency personnel and witnesses. Officer Barrera checked his computer system and discovered that there was an outstanding warrant for defendant's arrest. Once in custody, defendant admitted she was the driver of the car and that she hit the victims in the crosswalk. She claimed that when she hit the victims, she pulled her car over, got out, introduced herself to the girls and asked them if they were okay, helped one of the girls out of the road, then got back into her car and parked it in a safer spot so as not to interfere with traffic. Once re-parked, she got out of her car and asked an unknown bystander to call 911. However, she became nervous and left when fire department personnel arrived. She stated she "didn't mean to flee the scene and she was sorry for hitting the girls."

Defendant was charged with felony hit and run (count 1), driving an unregistered motor vehicle (count 2) and driving with a suspended license (count 3).

At trial, the defense investigator showed photographs and played a videotape of the area where the collision occurred, pointing out, among other things, the existence of "no parking" signs on Pershing.

At the conclusion of trial, defendant moved for dismissal of counts one and three. The court denied the motion. The jury found defendant guilty on all counts. The court denied defendant's motion for new trial and, following completion of a court-ordered diagnostic exam pursuant to Penal Code section 1203.03, suspended imposition of sentence, placed defendant on formal probation for five years and ordered that she serve one year in county jail. The court imposed restitution as determined by the probation department, a $200 restitution fine "with a ten percent surcharge," a $30 criminal conviction fee, and a $30 court security fee. The court awarded defendant 104 days of presentence custody credit. Defense counsel requested that the court also award defendant 104 days of conduct credit "in light of the recent law revisions," to which the court responded, "The jail calculates it. The jail calculates it."

4

Defendant filed a timely notice of appeal.

DISCUSSION

I

*Sufficiency of the Evidence of Hit and Run*

Defendant contends that her conviction for violating section 20001, subdivision (a), is not supported by sufficient evidence that she failed to perform the duties required of her as a matter of law.

Section 20001, subdivision (a) requires that the "driver of a vehicle involved in an accident resulting in injury to a person, other than himself or herself . . . shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of Sections 20003 and 20004." Section 20004 deals with a driver's duty upon the death of a victim and is therefore not applicable here.

Section 20003, subdivision (a) requires the driver to "give his or her name, current residence address, the names and current residence addresses of any occupant of the driver's vehicle injured in the accident, the registration number of the vehicle he or she is driving, and the name and current residence address of the owner . . . to any traffic or police officer at the scene of the accident," and requires the driver to "render to any person injured in the accident reasonable assistance, including transporting, or making arrangements for transporting, any injured person to a physician, surgeon, or hospital for medical or surgical treatment if it is apparent that treatment is necessary or if that transportation is requested by any injured person."

The crime of hit and run consists of a driver leaving the scene of an accident in which he had been involved with actual or constructive knowledge that a person was injured, even if the driver was not at fault in causing the accident. (See *People v. Harbert* (2009) 170 Cal.App.4th 42, 52-56; *People v. Braz* (1998) 65 Cal.App.4th 425, 432.) As we have said before, "Although a violation of section 20001 is popularly denominated

5

'hit-and-run,' the act made criminal thereunder is not the 'hitting' but the 'running.' "
(*People v. Corners* (1985) 176 Cal.App.3d 139, 148; see *People v. Powell* (2010) 181
Cal.App.4th 304, 316 [the criminal conduct "is not the causing of an accident or injury
but leaving the scene without presenting identification or rendering aid"].)

In determining the sufficiency of the evidence to support a conviction, we review
the entire record in the light most favorable to the prosecution to determine whether it
contains evidence that is reasonable, credible, and of solid value from which a rational
trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Valdez*
(2004) 32 Cal.4th 73, 104.) We presume the existence of every fact in support of the
evidence that the trier of fact could deduce from the evidence. (*People v. Lee* (1999) 20
Cal.4th 47, 58.) Inferences reasonably deducible from the evidence constitute substantial
evidence. The inferences need not be the only ones the evidence supports, and the
evidence of the ultimate fact in question need not be strong. (*People v. Wharton* (1991)
53 Cal.3d 522, 546; *People v. Johnson* (1980) 26 Cal.3d 557, 576.)

There is substantial evidence to support defendant's conviction for hit and run.
According to K.M., defendant hit D.C. and K.M., then stopped momentarily to ask if they
were okay, and then drove away when neither girl responded.

Percipient witness Bobby J. corroborated K.M.'s story, testifying that defendant
left the scene and drove away on Pershing as he followed behind her. Defendant turned
right on Poplar and drove approximately 50 feet before she parked her car. When
Bobby J. told her she needed to return to the intersection, defendant got out of her car and
walked back toward the intersection. Despite returning to the scene where fire personnel
were by that time tending to D.C. and K.M., defendant did not approach emergency
personnel or make herself known to anyone as the driver of the car that hit the victims.
When Bobby J. identified defendant to emergency personnel and told them where they
could find her car, defendant walked the opposite direction, away from her car.

Although defendant ultimately returned to her car and approached Officers Barrera and Raines, she did not disclose the fact that she owned the car or that she was involved in the collision until the officers asked her.

Defendant's claim that she could not legally park on Pershing and therefore drove to Poplar and stopped as soon as reasonably possible is unpersuasive. It is clear from Bobby J.'s testimony that defendant left the scene, drove down Pershing, turned onto Poplar and parked. After an admonishment from Bobby J. to return to the scene, defendant got out of her car and made her way back to the intersection where, instead of identifying herself and letting emergency responders know she was the driver involved in the collision, she stood with other bystanders and asked, "Que paso?" or "what happened?" Moreover, despite the "No Parking" signs on Pershing, Alan M. parked his car on the side of the road near the intersection and helped pull D.C. out of harm's way. Emergency vehicles parked near or in the intersection as well.

Defendant also claims she was not required to provide assistance to the victims because emergency responders were on-scene rendering medical assistance within minutes of the collision. She claims she fulfilled her duty to ascertain what assistance, if any, was necessary and made reasonable efforts to see that such assistance was provided when she rolled down her window and asked if the victims were okay, parked "nearby" and "went down to the intersection and saw that fire department officials were treating [D.C.]" She claims the fact that she saw D.C. was receiving treatment and "remained in the area" was sufficient to fulfill her duties as a matter of law. We do not agree.

According to Bobby J., the impact of defendant's car caused K.M. to spin around sideways and D.C. to be thrown onto the hood of the car, into the windshield and then onto the ground where she laid until K.M. and Alan M. pulled her to the sidewalk. The sheer force of the impact, the fact that D.C. was lying in the street, and the fact that neither D.C. nor K.M. responded when defendant asked if they were okay, should have indicated to defendant the immediate need to render reasonable assistance by, at the very

7

least, calling 911. She did not. She only became aware that emergency responders were on the scene tending to the victims after she drove away from the scene, parked her car over a block away, was told by Bobby J. to return to the scene, and then walked back to the intersection where the collision occurred. Despite the fact that she stood and observed the activities taking place for several minutes, it was not until she returned to her car and officers questioned her that she finally identified herself as the driver of the car that hit the victims. Defendant's efforts, what little there were, did not suffice to fulfill her duties under sections 20001 and 20003.

While on the one hand defendant acknowledges that sections 20001 and 20003 "are part of a statutory scheme which imposes on drivers the obligation to self-report when the driver's vehicle has been involved in an accident," on the other hand she argues she was not required by law to "spontaneously volunteer" her identifying information to anyone. She argues she was legally excused from providing her contact information to the victims because D.C. "was unconscious as a result of the accident." The argument does not hold water, given that defendant could not only have provided the required information to K.M., who was conscious and actively involved in rendering assistance to D.C., but also to Bobby J., emergency responders on-scene, anyone in the crowd gathered after the collision, or spontaneously to police officers after returning to her car.

Defendant argues further that she gave identifying information to Officers Barrera and Raines when prompted. She notes that she did not drive away from the scene without identifying herself to anyone; she did not move her car after parking it around the corner; and she did not give false information to police. More noteworthy, however, is the fact that she never called 911; she made no attempt to help the victims or give them her information; she never approached law enforcement officers or emergency responders and identified herself as the driver without first having to be asked; and, when police later questioned her, she lied, telling them she "got out of the car, helped the girls out of the road, introduced herself and then got back into her car to re-park it."

8

There is sufficient evidence to support defendant's conviction for felony hit and run.

## II

### *Outstanding Arrest Warrant*

Over defendant's objection, the trial court admitted into evidence an outstanding warrant issued for defendant for a probation violation for the limited purpose of showing a motive to flee and avoid police contact. Defendant contends this deprived her of her constitutional right to a fair trial and due process because the warrant was offered without evidence that she knew of its existence. As we shall explain, any error in admitting the outstanding warrant was harmless.

Evidence Code section 1101, subdivision (b), provides in relevant part that "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive . . .)" other than to prove criminal disposition or propensity is relevant and admissible. In determining whether circumstantial evidence of a prior uncharged bad act is admissible, the court considers the materiality of the fact sought to be proved, the tendency of the uncharged bad act to prove the material fact and the existence of any rule requiring exclusion. (*People v. Miller* (2000) 81 Cal.App.4th 1427, 1447.)

In admitting evidence of other crimes, the court must weigh the probative value of such evidence which must be substantial against the danger of undue prejudice, of confusing the issues or of misleading the jury. (*People v. Carter* (2005) 36 Cal.4th 1114, 1149.) We review the trial court's resolution of these issues for abuse of discretion. (*Ibid.*)

Here, we find no abuse of discretion. The trial court twice balanced the probative value of the warrant against its prejudicial effect and determined the former outweighed the latter. Indeed, the evidence of defendant's outstanding warrant was highly probative as to a possible motive for defendant to flee the scene to avoid being identified as the

9

driver of the car who hit the victims. Moreover, at the time the evidence was offered, the jury was properly admonished to consider it only for the limited purpose of determining whether defendant had a motive to flee the scene, and not to consider the evidence for any other purpose or conclude from the evidence that defendant has a bad character or is disposed to commit a crime. (*People v. Key* (1984) 153 Cal.App.3d 888, 899 [trial court had duty to tell jurors the precise issues to which the evidence was limited].) To that end, the court took judicial notice of the warrant and, in particular, that it "was for violation of probation for failure to report and/or notify the probation officer of correct living arrangements or failure to obey reasonable directions of the probation officer."

Defendant contends there was no evidence she knew about the outstanding warrant and thus it was not relevant to show motive. As a preliminary matter, she argues admission of the outstanding warrant to show motive to flee was irrelevant because there is no evidence she ever fled. We reject that argument based on the significant amount of evidence of evasive behavior and flight discussed in part I, *ante*, of this opinion, which we need not repeat here.

As for defendant's knowledge regarding the existence of the warrant, even were we to assume she had none, the jury was instructed to disregard evidence of the warrant under that circumstance, and we presume the jury to have followed that instruction. (*People v. Williams* (2010) 49 Cal.4th 405, 469; *People v. Gray* (2005) 37 Cal.4th 168, 231.)

III

*Presentence Custody Credits*

Defendant contends she is entitled to 105 conduct credits for a total of 210 presentence custody credits. The People argue that, although defendant was sentenced on March 1, 2010, after the statute's effective date, a "majority of her credits, however, were earned before the amended version of section 4019 was enacted." As such, the trial court appropriately employed a two-tiered calculation which recognizes the legislative intent to

encourage good behavior by awarding or increasing credit for good conduct during the period when the incentives where in place.

We conclude defendant's presentence custody credits are calculated as follows:

For the period January 15, 2009 through February 10, 2009 (27 actual days), defendant is entitled to 12 days of conduct credit, pursuant to Penal Code section 4019, as effective in 2009. That is, two days of conduct credit for every four days served. (*People v. Brown* (2012) 54 Cal.4th 314, 318 (*Brown*); *In re Marquez* (2003) 30 Cal.4th 14, 25-26 (*Marquez*).)

For the period December 14, 2009 through January 24, 2010 (42 actual days), defendant is entitled to 20 days of conduct credit, pursuant to section 4019, effective in 2009. (*Brown, supra,* 54 Cal.4th at p. 318; *Marquez, supra,* 30 Cal.4th at pp. 25-26.)

For the period January 25, 2010 through March 1, 2010 (36 actual days), defendant is entitled to 36 days of conduct credit, pursuant to section 4019, as effective on or after January 25, 2010. (*Brown, supra,* 54 Cal.4th at p. 318.)

Defendant is entitled to 105 days of actual custody credit, as acknowledged by the trial court in its amended minute order dated September 21, 2010, and is further entitled to 68 days of conduct credit. Thus, defendant is entitled to a total of 173 days of custody credit. We will direct the trial court to amend its minute order accordingly.

IV

*Booking Fee*

Defendant claims the $78 booking fee reflected in the court's written minute order must be stricken because it was neither orally imposed by the court at sentencing, nor is it mandated by statute. We agree.

As noted by defendant, there is a discrepancy between the clerk's minute order, which reflects a main jail booking fee of $78, and the court's oral pronouncement of judgment, which is silent in that regard. "The record of the oral pronouncement of the court controls over the clerk's minute order" (*People v. Farell* (2002) 28 Cal.4th 381,

11

384, fn. 2), which "may not add to or modify the judgment it purports to digest or summarize" (*People v. Mitchell* (2001) 26 Cal.4th 181, 185). The administrative fees for booking and classification of inmates are not mandatory. (Gov. Code, § 29550.2.) The $78 booking fee must therefore be stricken from the written minute order. We remand the matter to the trial court to amend the minute order to conform to its oral order. (*Mitchell,* at p. 185.)

### DISPOSITION

The matter is remanded to the trial court with directions to modify the written minute order and conditions of probation filed March 1, 2010 to (1) award defendant 105 days of actual credit and 68 days of conduct credit, for a total of 173 days of presentence custody credit, and (2) delete the $78 booking fee. The trial court is directed to transmit copies of the corrected minute order to defendant and to the probation department.

As modified, the judgment is affirmed.


      HULL      , J.


We concur:


      NICHOLSON      , Acting P. J.


      HOCH      , J.