Filed 10/16/20  P. v. Varela CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B293471 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA099063) |
| v. | |
| MYNOR ENRIQUE VARELA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James Otto, Judge.  Affirmed.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Following two jury trials, defendant Mynor Enrique Varela was convicted of second degree murder, gross vehicular manslaughter, two counts of assaulting a peace officer, and leaving the scene of an accident. The first jury returned guilty verdicts on the assault and leaving the scene of an accident counts, but could not reach a verdict on the murder and gross vehicular manslaughter counts. The second jury returned guilty verdicts on the remaining counts and found true the allegation that defendant knew or should have known that the victim was a police officer and used his vehicle as a deadly weapon.

On appeal, defendant contends that the prosecution was barred by the doctrine of collateral estoppel from pursing the murder count in the second trial because the first jury's finding that defendant left the scene of an accident precluded a subsequent finding that defendant acted with malice. Defendant also contends there was insufficient evidence to support the jury's true finding that he intentionally used his vehicle as a deadly weapon. We affirm.

# II. BACKGROUND

On May 3, 2014, at around midnight, defendant and his brother, B.V., went to a party at M.W.'s residence in Harbor City. The brothers arrived in defendant's 2005 Chevrolet Tahoe.

The party lasted into the early hours of May 3, 2014. B.V. became drunk, and defendant consumed several cans of beer, including one shortly before leaving the party.

At some point, B.V. argued with O.V. outside the residence. M.W. tried to intervene and told the two to leave, but the argument continued and escalated to a physical altercation. Other party attendees pulled B.V. away from the fight and put him into the Tahoe. Shortly thereafter, O.V. got into his Camaro.

A witness who observed the altercation called the police. Los Angeles Police Officers Richard Medina and Roberto Sanchez responded to the scene in a Crown Victoria (police car).

At some point, the Camaro started spinning "donuts" in the middle of the street and when it came to a stop, it was facing the responding police car. The Camaro then sped away, and the police car followed. Defendant, who had been stopped in the Tahoe, immediately sped after the police car.[1] The Camaro eventually made a U-turn, followed by the police car. As the police car was finishing its U-turn, the Tahoe crashed into it, injuring Officer Medina and killing Officer Sanchez.

Following the collision, defendant and B.V. got out of the Tahoe and fled the scene on foot. As he was fleeing, defendant bumped into a witness, who smelled alcohol on defendant's breath.

Police searched the Tahoe and found a partially full can of beer, an identification card, and a vehicle registration identifying defendant as the Tahoe's owner. Police then made efforts to locate defendant by contacting his relatives.

At around 1:30 p.m., approximately nine hours after the crash, defendant voluntarily appeared at the police station. At approximately 6:50 p.m., police obtained a blood sample from defendant. At that time, defendant had 0.0 percent blood alcohol content. Alcohol burns off at a rate of about one drink per hour.

---

[1]     We describe the details of the pursuit below.

3

The Los Angeles County District Attorney charged defendant by information with murder, in violation of Penal Code section 187, subdivision (a)[2] (count 1); gross vehicular manslaughter, in violation of section 192, subdivision (c)(1) (count 2); assault on a peace officer, in violation of section 245, subdivision (c) (counts 3 and 4); and leaving the scene of an accident, in violation of Vehicle Code section 20001, subdivision (a) (count 5).  As to count 1, the District Attorney alleged that defendant knew or should have known that the victim was an officer engaged in his duties and intended to inflict great bodily injury or used a deadly weapon within the meaning of sections 190, subdivision (c), 12022, and 12022.7; and that defendant personally used a deadly weapon—an automobile—in the commission of the crime, within the meaning of section 12022, subdivision (b)(1).  As to both counts 1 and 2, the prosecution alleged that defendant fled the scene of a crime, within the meaning of Vehicle Code section 20001, subdivision (c).  As to counts 4 and 5, the prosecution further alleged that defendant personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a).

Following the first trial, the jury found defendant guilty on counts 3, 4, and 5 and found the great bodily injury allegation to be true.  But the jury was unable to reach verdicts on counts 1 and 2.

Following a retrial, a second jury found defendant guilty of counts 1 and 2, and also found true the special circumstance allegation as to count 1 and the fleeing the scene of a crime allegation as to count 2.

---

[2]     All further statutory references are to the Penal Code unless otherwise indicated.

# III.  DISCUSSION

A.    *Collateral Estoppel*

Defendant contends that the prosecution was barred by the doctrine of collateral estoppel from retrying him on the murder count because the jury's finding of guilt on the leaving the scene of an accident count established that "the homicide was accidental."  According to defendant, the jury's finding of guilt on count 5, "necessarily include[d] a finding there was an accident, [which] finding cannot be reconciled with the mental state required for murder."  We disagree.

### 1.    Background

Prior to the retrial on counts 1 and 2, defendant made an oral motion to dismiss the murder count based on the doctrine of collateral estoppel.  At defendant's request, the trial court took the matter under submission so that defendant could file a written motion.

Defendant subsequently filed a written motion to dismiss the murder count.  The prosecutor orally opposed the motion, arguing that there was no special finding by the jury that defendant's conduct was the result of an accident and the jury's verdict therefore did not collaterally estop the prosecution from retrying defendant on the murder count.  The trial court denied the motion.

2.   Analysis

Under the doctrine of collateral estoppel, "'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" (*People v. Catlin* (2001) 26 Cal.4th 81, 124, quoting *Ashe v. Swenson* (1970) 397 U.S. 436, 443.) A fact has been determined if "the issue is identical to an issue decided in a prior proceeding; . . . the issue was actually litigated; . . . the issue was necessarily decided; . . . the decision in the prior proceeding is final and on the merits; and . . . the party against whom collateral estoppel is asserted was a party to the prior proceeding or in privity with a party to the prior proceeding." (*Zevnik v. Superior Court* (2008) 159 Cal.App.4th 76, 82). "The party asserting collateral estoppel bears the burden of establishing these requirements. [Citation.]" (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.) We apply a de novo standard of review. (*Cheveldave v. Tri Palms Unified Owners Assn.* (2018) 27 Cal.App.5th 1202, 1219.)

Defendant's collateral estoppel argument is premised on his view that the term "accident," as used in Vehicle Code section 20001, subdivision (a), "refers to an event that is unexpected and without intent."[3] "Generally, the claim that a homicide was

---

[3]   Vehicle Code section 20001, subdivision (a) provides that "[t]he driver of a vehicle involved in an accident resulting in injury to a person, other than himself or herself, or in the death of a person shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of [Vehicle Code s]ections 20003 and 20004 [requiring that the driver identify himself, provide additional information to law enforcement, render reasonable assistance, and in the case of resulting death,

6

committed through misfortune or accident 'amounts to a claim that the defendant acted without forming the mental state necessary to make his . . . actions a crime." (*People v. Jennings* (2010) 50 Cal.4th 616, 674.)

Defendant cites *State v. Liuafi* (Hawaii 1981) 1 Haw.App. 625 in support of his argument. In that case, the Hawaii Court of Appeals considered whether defendant could be convicted of both attempted murder and failure to render assistance. (*Id.* at p. 640.) The court cited the dictionary definitions of "accident" which included a "sudden event . . . occurring without intent or volition," and concluded that "the word 'accident', taken in its usual sense, and with reference to the purpose of [the Hawaii statute that criminalizes the failure to render assistance following an accident], excludes the event that occurred in this case. An intentional attempt to murder a person by using one's vehicle as a weapon does not fit within the general, popular, usual sense of the word 'accident.'" (*Id.* at pp. 642–643.) The court therefore vacated defendant's conviction for failure to render assistance. (*Id.* at p. 643.)

We agree that the Hawaii statute at issue in *State v. Liuafi* is similar to Vehicle Code section 20001, subdivision (a), including its use of the term "accident." We nonetheless decline to adopt the Hawaii Court of Appeals' interpretation of "accident" and instead adopt the reasoning of our sister court in *People v. Jiminez* (1992) 11 Cal.App.4th 1611 (*Jimenez*), disapproved on

report the accident to the nearest office of the Department of California Highway Patrol]." "'The gravamen of a [Vehicle Code] section 20001 offense . . . is not the initial injury of the victim, *but leaving the scene without presenting identification or rendering aid.*' [Citations.]" (*People v. Braz* (1998) 65 Cal.App.4th 425, 432.)

7

other grounds in *People v. Korbin* (1995) 11 Cal.4th 416, 419. The court in *Jiminez*, in construing the term "accident" observed that "[t]he legislative intent underlying Vehicle Code section 20001 is to benefit persons who suffer injuries as a result of occurrences involving vehicles. A construction of the statute which would excuse those drivers who intended to cause an injury-producing occurrence from a duty imposed on all other involved drivers would produce the absurd result that drivers with the highest level of fault for the injury-producing occurrence could shirk their responsibilities with impunity while those drivers who were merely negligent or without fault were burdened with the statute's requirements. Because such a construction of the statute would be absurd, unreasonable and contrary to the law's purpose, we hold that Vehicle Code section 20001 applies to all drivers of vehicles involved in injury-producing events. 'Accident' is used in Vehicle Code section 20001 to refer to an incident or event." (*Id.* at p. 1626; accord *People v. Campbell* (2017) 12 Cal.App.5th 666, 673.)

Because defendant's conviction for leaving the scene of an accident did not include a necessary finding that defendant acted without intent in causing the collision, collateral estoppel did not bar the retrial on the murder count.

B. *Use of a Deadly Weapon*

Defendant next argues that there was insufficient evidence to support the jury's finding that he used his vehicle as a deadly weapon. According to defendant, "[t]he inference [defendant] was using his car to hit the police car is not credible" because

purposely driving into another car would have been suicidal. We conclude substantial evidence supported the jury's true finding.

### 1. Background

Officers with the Los Angeles Police Department Multi-Disciplinary Collision Investigation Team collected photographs from the scene of the collision, as well as crash and pre-crash data from the Camaro, the police car, and the Tahoe. The prosecution and defense accident reconstruction experts examined these materials.

#### a. Prosecution expert

Los Angeles Police Department Officer Jahna Rinaldi testified as the prosecution accident reconstruction expert. After reviewing photographs, data, and witness interviews, Rinaldi described how the Tahoe, which weighed 5,350 pounds, followed the police car, which weighed 4,350 pounds, by accelerating from a stationary position to over 60 miles per hour, the Tahoe's maximum rate of acceleration. The Tahoe continued at 60 miles per hour—close to double the 35 miles per hour speed limit—and caught up with the police car. At that point, the police car was traveling around 15 miles an hour and attempting a U-turn to continue following the Camaro. Defendant crashed into the police car before it could complete its turn.

Based on the precrash data, Rinaldi determined that five seconds before impact, the Tahoe's speed was 63 miles per hour and the driver was coasting, that is, his foot was off the accelerator and the brake.

Four seconds before impact, the Camaro was halfway through its U-turn and the police car was changing lanes and following the path of the Camaro. The police car traveled at about 15 miles per hour and the Tahoe traveled at 62 miles per hour. Had defendant applied hard braking at this time, the Tahoe would have stopped 149 to 158 feet before impact. Defendant instead tapped the brake.

Three seconds before impact, the police car traveled at 15 miles per hour and the Tahoe traveled at 60 miles per hour. At that point, defendant was again coasting. Had he applied hard braking, the Tahoe would have stopped between 114 and 123 feet from impact.

Two seconds before impact, when the Camaro had nearly finished its U-turn, the police car was following it at 14 miles per hour, and the Tahoe continued to travel at 60 miles per hour. At this point, defendant pressed the accelerator to maintain a speed of 60 miles per hour. If defendant had applied hard braking two seconds prior to the crash, the Tahoe would have stopped 26 to 35 feet before impact.

At 1.2 seconds before impact, the Tahoe was traveling at 58 miles per hour. At one second before impact, defendant did apply brakes, but did not hard brake. Had defendant applied hard braking, the Tahoe would still have struck the police car, but the impact would have been with the rear of the police car rather than its side. Further, at about this time, the Tahoe crossed the double yellow lines, toward the police car. Had the Tahoe proceeded straight, maintaining its lane position instead of turning toward the left, it would not have struck the police car.

b.      Defense expert

Babak Malek testified as defendant's expert.  Malek testified that the speed of the Tahoe at the moment of impact was between 45.7 to 47.8 miles per hour.  One second prior to impact, the Tahoe was traveling 58 miles per hour.  Malek opined that this speed reduction reflected moderate braking "consistent with a conscious choice to avoid collision."  He also opined that the vehicle's movement toward the left was "consistent with a maneuver to avoid an accident."

2.      Analysis

We review the jury's true finding for sufficient evidence. (See *People v. Marshall* (1997) 15 Cal.4th 1, 34.)  Under that standard, a reviewing court determines whether any rational jury could have found defendant guilty beyond a reasonable doubt, after viewing evidence in the light most favorable to the prosecution.  (*Ibid.*; *People v. Johnson* (1980) 26 Cal.3d 557, 562.) Moreover, "'[w]e resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence'"—meaning reversal is only warranted if it appears ""'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.  [Citation.]" (*People v.  Zamudio* (2008) 43 Cal.4th 327, 357.)

The evidence reasonably supports the jury's finding that defendant intentionally used his car as a deadly weapon.  (*People v. Golde* (2008) 163 Cal.App.4th 101, 116 [finding that an automobile may be a deadly weapon if used in a manner capable of, and likely to, cause death or great bodily injury].)  Defendant,

11

who had recently consumed beer, purposely pursued the police car at a high rate of speed, reaching the maximum rate of acceleration for the Tahoe to do so. Even as the distance between the Tahoe and the police car narrowed, defendant did not apply hard brakes and instead tapped the brakes and then pressed the accelerator. Further, rather than drive straight forward on his path, which would have avoided a collision, defendant steered his Tahoe, a heavy sports utility vehicle, toward the lighter police car, resulting in a fatal collision. Given the relative size of the two vehicles, we are not persuaded by defendant's argument that defendant could not have intended to strike the police car because to do so would have been suicidal. Indeed, defendant and his brother successfully fled from the collision site, relatively unscathed. In any event, even if defendant had intended to hurt himself, that intent would not undermine his additional intent to pursue, steer toward, and collide with a police car.

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


KIM, J.


We concur:


BAKER, Acting P. J.


MOOR, J.

13